IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
**Chief Judge Edward W. Nottingham**

Civil Action No. 07–cv–00816–EWN–BNB

CHARLOTTE VIGIL,

      Plaintiff,

v.

SAFEWAY, INC.,

      Defendant.

---

## ORDER AND MEMORANDUM OF DECISION

---

      This is a Title VII and a breach of contract case that comes before the court on Defendant

Safeway Inc.'s motion for summary judgment, filed December 20, 2007. Jurisdiction is

premised upon 28 U.S.C. §§ 1331 and 1343 and the doctrine of pendent jurisdiction.

## FACTS

*1.*     **Factual Background**

    *a.*     **In General**

      Plaintiff, Charlotte Vigil, was employed as a part-time pharmacy technician at Safeway

from July 2000 to February 2004. (Safeway's Br. in Supp. of Mot. for Summ. J. [filed Dec. 20,

2007] [hereinafter "Def.'s Br."], Statement of Undisputed Material Facts [hereinafter "SOF"] ¶¶

1, 53; *admitted at* Pl.'s Resp. to Def.'s Br. in Opp'n to Safeway's Br. in Supp. of Its Mot. for

Summ. J. [filed Jan. 22, 2008] [hereinafter "Pl.'s Resp."], Resp. to Statement of Undisputed

Material Facts [hereinafter "RSOF"] ¶¶ 1, 53.) "Pharmacy technicians are unlicensed personnel working under the licensure of pharmacists." (*Id.*, SOF ¶ 9; *admitted at* Pl.'s Resp., RSOF ¶ 9.) Among other things, a pharmacy technician, under the direct supervision of the pharmacist on duty, performs computer data entry and takes certain preliminary steps in the preparation of prescriptions. (*Id.*, SOF ¶ 10; *admitted at* Pl.'s Resp., RSOF ¶ 10.)

In late 2002, Julie Birch, a pharmacy technician, alleged that Janet Gallegos, Plaintiff's then pharmacy manager, told her that "she [Ms. Gallegos] had tried everything she could think of to make Ms. Vigil quit, but she wouldn't quit," and that "she made Ms. Vigil do all of the filing, run the register all day and tried to make her miserable enough to quit." (Pl.'s Resp., Statement of Additional Undisputed Facts [hereinafter "SAF"] ¶ 24; *admitted at* Safeway's Reply in Supp. of Mot. for Summ. J. [filed Feb. 15, 2008] [hereinafter "Def.'s Reply"], Response to Statement of Additional Undisputed Facts [hereinafter "RSAF"] ¶ 24.)

On December 23, 2002, Plaintiff filed a charge of discrimination with the EEOC, based on national origin and age, alleging that she was denied a transfer and was subsequently constructively discharged from her position as a pharmacy technician. (Def.'s Br., Ex. C [12/23/02 EEOC Charge].) In March 2003, Safeway entered into a "No-Fault Settlement Agreement" with Plaintiff in which it agreed to "reinstate Plaintiff to her former position and to support her request for additional training available through the company." (*Id.*, SOF ¶ 4; *admitted at* Pl.'s Resp., RSOF ¶ 4.)

"Ms. Vigil was reinstated in June 2003, and worked under a new Pharmacy Manager, Steve Gillispie," and "two new staff pharmacists, Karen Welch and Julie Papineau." (*Id.*, SOF

¶¶ 6–7; *admitted at* Pl.'s Resp., RSOF ¶¶ 6–7.)  Plaintiff "preferred working the input (drop-off) window" and Mr. Gillispie allowed her to do so "unless he needed her to do something else at the time."  (*Id.*, SOF ¶¶ 22, 24; *admitted at* Pl.'s Resp., RSOF ¶¶ 22, 24.)  Like other pharmacy technicians, Plaintiff was also required to perform cashiering duties.  (*Id.*, SOF ¶¶ 26–27; *admitted at* Pl.'s Resp., RSOF ¶¶ 26–27.)  Plaintiff chose to work evening shifts during which there are "fewer prescription drop-offs and more pick-ups."  (*Id.*, SOF ¶ 27; *admitted at* Pl.'s Resp., RSOF ¶ 27.)

Plaintiff alleges that in "August/September 2003, Safeway laid off three pharmacy technicians, including Ms. Vigil.  The three technicians were ultimately brought back to Safeway, but Ms. Vigil was the last to be recalled, despite having more seniority than the other two technicians."  (Pl.'s Resp., SAF ¶ 18, Ex. 8 [Correspondence], Ex. 12 ¶ 8 [Vigil's Aff.].)  Defendant alleges that this was a result of a mix up, citing an internal email stating that "Charlotte was reinstated due to a mix up in seniority rights.  She was only gone for one week and came back.  James Chung said we had to bring her back."  (Def.'s Reply, RSAF ¶ 18, Ex. 8 at 4 [Internal E-mail Correspondence].)

### b.     *Plaintiff's November 2003 Letter to Defendant*

On November 7, 2003, Plaintiff wrote to Defendant:

> Pertaining to our settlement documentation paragraph 2E which states upon charging party's return to work as a Pharmacy Technician, respondent will support Charging Party's request for additional training available through the company.  I feel I am lacking in the training in third party insurances, input of new RX.  It seems when I come in, the only available position, is prescriptions at the pick-up window where all I do is cashier work.

(Pl.'s Resp., Ex. 7 at 2 [11/07/03 Letter].)

Plaintiff also stated: "I feel the problem I had before evidently has caused her [Julie Papineau] to form an opinion of me without being fair and opened [sic] minded." (*Id.*) Plaintiff claimed that when Mr. Gillispie was present Ms. Papineau treated her normally, but in his absence Ms. Papineau acted differently and treated her in a demeaning manner that made her feel inferior to the other technicians. (*See id.*, Ex. 7 at 2 [11/07/03 Letter], Ex. 12 ¶ 7 [Vigil's Dep.].)

### c.    *The Incident That Allegedly Resulted in Plaintiff's Discharge*

On January 21, 2004, Plaintiff, while assigned to inputting duties at the pick-up window of the pharmacy, answered a telephone call from a nurse identified as Amy. (Def.'s Br., SOF ¶ 33; *admitted at* Pl.'s Resp., RSOF ¶ 33.) The nurse "identified a certain patient by name and requested to have the patient's prescription dispensed with four additional refills." (*Id.*, SOF ¶ 34; *admitted at* Pl.'s Resp., RSOF ¶ 34.) Plaintiff asked the nurse if the prescription was a refill, and the nurse said "yes." (*Id.*, SOF ¶ 33; *admitted at* Pl.'s Resp., RSOF ¶ 33.) The nurse "then asked Plaintiff to increase the dosage strength of the medication from 50 mg to 100 mg." (*Id.*, SOF ¶ 36; *admitted at* Pl.'s Resp., RSOF ¶ 36.) Defendant does not disagree with Plaintiff's allegation that:

> I brought a phone doctor label out of the computer with all the information on
> that prescription drug that Amy [the nurse Plaintiff thought was calling from
> Dr. Peterson's office] was saying, except she said from 50 milligrams, she
> wanted it changed to 100 milligrams, with four refills. And that's what I did.
>
> Q.    What happened next?
>
> A.    Well, I proceeded – at that time I asked Julie [Papineau] if it was okay

if I input . . . .  She asked Patty, and she said, "we'll go ahead and have you go
to input prescriptions for a while."

In the meantime, I had that label that I had just brought up.  Like I said, with
the phone label doctor, we were able to write the changes, call the doctor,
verify the changes, and then change it.  I proceeded to fill it.  And then she
asked me, "Charlotte, did you take this refill?"  And I said, "Yes, I did."  And
she said, "You can't do that."  I said, "Oh, well, I'm sorry, I did not realize that
I could not take it."

After that, there was no talk about the prescription or anything else, until I was
suspended, I didn't know there was a problem.

(Def.'s Reply, Ex. Q at 20 [Vigil's Dep], *see also* Def.'s Reply at 5 [citing excerpts of Ex. Q at

20 (Vigil's Dep.)].)

"[Ms.] Papineau wrote a note to Karen Welch, the pharmacist on duty the following

morning, to verify with the prescribing doctor's office the increase in the prescription strength of

the medication."  (Def.'s Br., SOF ¶ 46; *admitted at* Pl.'s Resp., RSOF ¶ 46.)  Ms. Welch then

contacted Dr. Peterson's office and was informed that they did not have a nurse named Amy and

that the patient's prescription had not changed.  (Def.'s Br., Ex. I at 16 [Chung Dep.].)

Defendant later learned about the patient's new doctor:

The new doctor, I believe, was mentioned by Charlotte because she was
adamant during my initial sit in with her, when I gave her the written
documentation, that there was an Amy that called from the doctor's office, yet
when we called the doctor's office, we couldn't find an Amy.  So I believe that
instigated further research, where Karen has called around to see if there are
any Amy's that worked in the doctor's office, or maybe she called the patient –
I don't know what took place.

(*Id*.)  Plaintiff was placed on suspension on February 6, 2004, and was later discharged, effective

February 25, 2004.  (*Id.*, SOF ¶¶ 51–53; *admitted at* Pl.'s Resp., RSOF ¶¶ 51–53.)  "Regional

Pharmacy Manager James Chung recommended to the Director of Pharmacy Operations that plaintiff be terminated." (*Id.*, SOF ¶ 54; *admitted at* Pl.'s Resp., RSOF ¶ 54.)

On March 4, 2004, Plaintiff sent a letter to Defendant explaining the events since 2002, and appealing her termination, claiming that she was "unfairly treated and discriminated against by being terminated instead of receiving less severe discipline." (Pl.'s Resp., Ex. 7 at 4 [04/04/04 Letter].) Defendant denied Plaintiff's request for reinstatement, arguing that Plaintiff was terminated because she "violated a rule or regulation of the State Board of Pharmacy and Safeway policy." (*Id.*, Ex. 7 at 6 [Defendant's Denial Letter].)

Plaintiff now states: "as it turned out, it wasn't a refill, it was a new prescription." (*Id.*, SOF ¶ 43; *admitted at* Pl.'s Resp., RSOF ¶ 43.)

Plaintiff alleges that (1) all the employees terminated by Safeway "had multiple disciplinary actions prior to their termination;" (2) "the only similarly situated employee that was fired over one misfill mistake was a lady pharmacist who '*almost killed a patient*;'" and (3) "Safeway identified another pharmacist who had been involved in several misfill incidents, but received only a disciplinary action." (Pl.'s Resp., SAF ¶¶ 21–23, Ex. 11 at 13–14 [Chung Dep.] [emphasis in original].) Safeway, before it fired Plaintiff, learned that the patient on whose behalf "Amy" had called had gone to a new doctor who had prescribed the medication with the higher strength. (Pl.'s Resp., RSOF ¶ 48; *admitted at* Def.'s Reply, Reply Concerning Undisputed Facts ¶ 48.) On August 24, 2004, Plaintiff filed her second EEOC charge. (Def.'s Br., SOF ¶ 57; *admitted at* Pl.'s Resp., RSOF ¶ 57.)

### d. The Colorado Board of Pharmacy Regulations

"The practice of pharmacy is declared a professional practice affecting the public health, safety, and welfare and is subject to regulation and control in the public interest." COLO. REV. STAT. § 12-22-101. "'***Practitioner***' means a person ***authorized by law*** to prescribe any drug or device, acting within the scope of such authority." *Id*. § 12-22-102 (emphasis added).

Pursuant to the Colorado Revised Statutes section 12-22-102, this Act "shall apply to ***licenses and registrations*** related to the practice of pharmacy." *Id*. (emphasis added). Under the Act's definitions: "'Pharmacist' means an individual ***licensed*** by this state to engage in the practice of pharmacy," while "'Pharmacy technician' means an ***unlicensed*** person who performs those functions set forth in paragraph (b) of subsection (26) of this section under the supervision of a pharmacist." *Id.* (emphasis added). Paragraph (b) of subsection (26) includes: (I) the preparation, mixing, assembling, packaging, labeling, or delivery of a drug or device; (II) proper and safe storage of drugs or devices; and (III) the maintenance of proper records for such drugs and devices. *Id*.

### e. The Colorado Division of Civil Rights' Determination Letter

On October 18, 2005, the Colorado Civil Rights Division ("CCRD") issued a determination letter "finding Safeway had violated C. R. S. §24-34-402, in respect to Ms. Vigil's claim of retaliation." (Pl.'s Resp., SAF ¶ 1; *admitted at* Def.'s Reply, RSAF ¶ 1.) The CCRD's conclusion is, in part, based on its findings that (1) "[t]he Charging Party complained to the management about the mistreatment and finally formalized her concerns about the work environment by sending a letter on November 7, 2003, outlining her concerns and referencing

the charge of discrimination that she had filed earlier;" (Pl.'s Resp., Ex. 1 at 5 [Determination Letter]), (2) "[t]he multiple complaints by the Charging Party, *i.e.*, the formal CCRD complaint coupled with her internal letter of complaint of unfair treatment in November 2003, and subsequent discharge in February 2004, gives rise to the timely nexus between a verified complaint and an adverse employment act against the Charging Party causing termination;" (*Id.*), and (3) "Safeway obtained new information, prior to Ms. Vigil's termination, which vindicated her, but Safeway discharged her, nevertheless, in spite of having in its possession information which exonerated Ms. Vigil." (Pl.'s Resp., SAF ¶ 2; *admitted at* Def.'s Reply, RSAF ¶ 2.)

## 2. *Procedural History*

On July 10, 2007, Plaintiff filed her second amended complaint claiming that Defendant: (1) retaliated against her for exercise of rights under federal law; and (2) breached the no-fault settlement agreement. (Second Am. Compl. and Jury Demand [filed July 1, 2007] [hereinafter "Compl."].) On December 20, 2007, Defendant filed its brief in support of a motion for summary judgment. (Def.'s Br.) First, Defendant argues that "Plaintiff's retaliation claim must be dismissed" because (1) the adverse action she allegedly experienced after filing her first EEOC charge in 2002 is not material, and her discharge in 2004 "lacks sufficient nexus to her December 2002 charge of discrimination;" (2) Plaintiff's November 7, 2003 letter "fails to specify violations of Title VII or the ADEA," and fails to offer "circumstantial evidence of retaliatory motive;" and (3) Defendant offers a legitimate non-retaliatory reason for discharging her. (*Id.* at 9–16.) Second, Defendant argues that "Plaintiff's breach of contract claim must be

dismissed" because "Safeway had more than discharged any obligation it may have assumed though the Agreement." (*Id*. at 16–17.)

On January 22, 2008, Plaintiff responded arguing that "Safeway's assorted arguments concerning no material adverse action; lack of temporal proximity; and a legitimate non-retaliatory reason for termination are without merit." (Pl.'s Resp. at 11.) More specifically, Plaintiff argues that: (1) Defendant cannot separate the incidents between her first EEOC charge and discharge and the court must look at Defendant's pattern of retaliatory conduct starting "almost immediately after her reinstatement pursuant to the No-Fault Settlement Agreement;" (2) Plaintiff "has set forth sufficient evidence of pretext to overcome Safeway's motion for summary judgment;" and (3) Safeway has offered no evidence that can demonstrate what subjects were covered in the July and November 2003 training courses. (*Id*. at 11–14.) On February 15, 2008, Defendant replied. (Def.'s Reply.)

## ANALYSIS

### 1.    *Legal Standard for Summary Judgment*

Pursuant to Rule 56(c) of the Federal Rules of Civil Procedure, the court may grant summary judgment where "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(c); *see Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248–50 (1986); *Concrete Works, Inc. v. City & County of Denver*, 36 F.3d 1513, 1517 (10th Cir. 1994). The moving party bears the initial burden of showing an absence of evidence to support the nonmoving party's case. *Celotex Corp. v. Catrett*, 477 U.S. 317, 325

(1986).  "Once the moving party meets this burden, the burden shifts to the nonmoving party to demonstrate a genuine issue for trial on a material matter."  *Concrete Works*, 36 F.3d at 1518 (citing *Celotex,* 477 U.S. at 325).  The nonmoving party may not rest solely on the allegations in the pleadings, but must instead designate "specific facts showing that there is a genuine issue for trial."  *Celotex*, 477 U.S. at 324; *see* FED. R. CIV. P. 56(e).  A fact in dispute is "material" if it might affect the outcome of the suit under the governing law; the dispute is "genuine" if the evidence is such that it might lead a reasonable jury to return a verdict for the nonmoving party. *Allen v. Muskogee*, 119 F.3d 837, 839 (10th Cir. 1997) (citing *Anderson*, 477 U.S. at 248).  The court may consider only admissible evidence when ruling on a summary judgment motion.  *See World of Sleep, Inc. v. La-Z-Boy Chair Co.*, 756 F.2d 1467, 1474 (10th Cir. 1985).  The factual record and reasonable inferences therefrom are viewed in the light most favorable to the party opposing summary judgment.  *Byers v. City of Albuquerque*, 150 F.3d 1271, 1274 (10th Cir. 1998) (citing *Concrete Works*, 36 F.3d at 1517).

**2.     *Evaluation of Claims***

**a.     *The Retaliation Claim***

Plaintiff claims Defendant fired her in retaliation for her multiple oral and written complaints regarding Defendant's alleged pattern of discrimination against her, including her formal EEOC and CCRD complaints and the November 2003 letter.

"To establish a prima facie claim for retaliation, an employee must establish (1) he or she engaged in protected opposition to discrimination; (2) a reasonable employee would have found the challenged action materially adverse; and (3) a causal connection exists between the

-10-

protected activity and the materially adverse action." *Piercy v. Maketa*, 480 F.3d 1192, 1198

(10th Cir. 2007) (citing *McGowan v. City of Eufala*, 472 F.3d 736, 741 [10th Cir. 2006]).

"Following the well-known *McDonnell Douglas* test, if a prima facie case is established, the

employer can rebut it by articulating a 'legitimate nondiscriminatory reason' for the adverse

action." *Id.* (citing *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802–04, 93 S.Ct. 1817

[1973]). "The burden then shifts back to the employee to show that the proffered reason actually

is a pretext masking discriminatory animus." *Id.* (citation omitted).

### i.      Prima Facie Case

Plaintiff's "filing of an EEOC complaint is protected conduct," and "her dismissal was an

adverse employment action." *Piercy*, 480 F.3d at 1198. Therefore, Plaintiff has satisfied the

first two elements.

Next, Plaintiff has to demonstrate a causal connection between her filing of the 2002

EEOC complaint and her discharge in 2004. "A retaliatory motive may be inferred when an

adverse action closely follows protected activity. However, unless the termination is very

closely connected in time to the protected activity, the plaintiff must rely on additional evidence

beyond temporal proximity to establish causation." *Id*. (citations and internal quotation omitted).

While the Tenth Circuit has "'recognized that protected conduct closely followed by

adverse action may justify an inference of retaliatory motive,' nonetheless, 'the phrase "closely

followed" must not be read too restrictively where the pattern of retaliatory conduct begins soon

after the [protected action] and only culminates later in actual discharge.'" *Id.* at 1199 (citing

*Marx v. Schnuck Mkts., Inc.*, 76 F.3d 324, 329 [10th Cir. 1996]). Therefore, "the passage of time

does not necessarily bar a plaintiff's retaliation claim if additional evidence establishes the retaliatory motive. Other evidence in the record could establish an adverse employment action taken after a lengthy period of time was still in response to the earlier, protected activity — temporal remoteness is not necessarily dispositive." *Id.*

In the instant case, Plaintiff claims that Defendant's pattern of retaliatory conduct began soon after her reinstatement in 2003, after the filing of the EEOC charge and entering into the subsequent no-fault settlement agreement, and only culminated later in her actual discharge in 2004. Aside from the 2002 EEOC charge, the possible protected act would be her November, 7, 2003 letter.

The salient facts are as follows. On December 23, 2002, Plaintiff filed a charge of discrimination with the EEOC. (Def.'s Br., Ex. C [12/23/02 EEOC Charge].) In late March 2003, Safeway entered into a no-fault settlement agreement with Plaintiff, and the agreement was approved by the CCRD on April 22, 2003. (*Id.*, SOF ¶ 4; *admitted at* Pl.'s Resp., RSOF ¶ 4.) Plaintiff was reinstated in June 2003. (*Id.*, SOF ¶¶ 6–7; *admitted at* Pl.'s Resp., RSOF ¶¶ 6–7.) In "August/September 2003, Safeway laid off three pharmacy technicians, including Ms. Vigil. The three technicians were ultimately brought back to Safeway, but Ms. Vigil was the last to be recalled, despite having more seniority that the other two technicians." (Pl.'s Resp., SAF ¶ 18, Ex. 8 [Correspondence], Ex. 12 ¶ 8 [Vigil's Aff.].) On November 7, 2003, Plaintiff (1) shared her concern regarding the retaliatory work environment subsequent to her problem with Defendant, and (2) cited the particular provision of their no-fault settlement agreement addressing Defendant's commitment to provide any available training through Safeway at

-12-

Plaintiff's request. (Pl.'s Resp., Ex. 7 at 2 [11/07/03 Letter].) On January 21, 2004, Plaintiff answered the phone call that resulted in her discharge. (Def.'s Br., SOF ¶ 33; *admitted at* Pl.'s Resp., RSOF ¶ 33.) On February 6, 2004, Plaintiff was placed on suspension and was later discharged, effective February 25, 2004. (*Id.*, SOF ¶¶ 51–53; *admitted at* Pl.'s Resp., RSOF ¶¶ 51–53.)

Viewing these facts in the light most favorable to Plaintiff, they support a theory that (1) Plaintiff notified Defendants that she was being retaliated against by her supervisor and that Defendant is in breach of the no-fault settlement agreement, (2) her supervisors subsequently commenced an investigation based on her alleged violation of the Board of Pharmacy and Safeway policies, which (3) culminated in a recommendation that Plaintiff be discharged, and (4) Plaintiff was discharged even after obtaining information, regarding the second doctor, that exonerated her.

The court finds that although some of these facts are disputed, they link Plaintiff's protected conduct with an adverse employment action in a temporally sufficient manner. Accordingly, Plaintiff has, for purposes of summary judgment, satisfied the third element of a prima facie case, *i.e.*, causation.

### ii.      *Legitimate, Nondiscriminatory Reason*

In response to Plaintiff's prima facie showing, defendant is entitled to offer a "legitimate, nondiscriminatory reason for the adverse employment action." *Piercy*, 480 F.3d at 1200. Defendant claims Plaintiff was fired because she violated the Board of Pharmacy Regulations and Safeway policy. (Def.'s Br., Ex. 7 at 6 [Defendant's Denial Letter].) Plaintiff argues that

Defendant's reason is not legitimate because (1) Defendant did not train Plaintiff regarding the particular policy and State Board of Pharmacy Regulation at issue in this case, *i.e.*, pharmacy technicians cannot change the strength of prescriptions; and (2) Defendant has not fired any other pharmacy technician for such a reason. (*See* Pl.'s Resp. *passim*.)

In this case, there are disputed and undisputed material issues of fact that prevent Defendant from offering proof sufficient to merit summary judgment of the legitimacy of its proffered non-retaliatory reason.

### A. Did Safeway Train Ms. Vigil Regarding the Change in Strength of a Prescription?

Defendant states that its reason for firing Plaintiff was her violation of State Board of Pharmacy and Safeway policy, and asserts that "Safeway pharmacy technicians are trained on what duties they may and may not perform under State Board of Pharmacy rules and regulations and Safeway policies." (Def.'s Br., SOF ¶ 10.) Plaintiff claims that Defendant's proffered reason for firing Plaintiff is not legitimate and argues that:

> Safeway does not identify the specific State Board of Pharmacy rules and regulations or Safeway policies, which specifically address or explicitly state that a change in strength constitutes a new prescription; or that a technician may not change the strength when dealing with a refill situation," and that "Safeway did not train or make this explicitly known, in any manner, to Ms. Vigil, who was terminated for violating the aforementioned.

(Pl.'s Resp., RSOF ¶ 10.) Defendant replies:

> Plaintiff never disputed (until now) the fact that her job as Pharmacy Technician was governed by State Board of Pharmacy regulations and Safeway policies. To the contrary, plaintiff testified that she had reviewed her job description while employed at Safeway. Vigil Depo. at 81:21 – 82:5, 82:13-20 (Ex. Q, attached). The job description states: "The duties of the

Technician are regulated by individual State Boards of Pharmacy." (Ex. R at p.2, attached). It further specifies that Pharmacy Technicians "MAY NOT . . . [a]ccept[] a new, or part of a new, prescription over the phone." *Id*. at p.3 (emphasis original). Plaintiff had also reviewed and studied the State Board of Regulations both while working at Safeway and while enrolled in pharmacy technician school. Vigil Depo. (Ex. Q) at 82:21 – 84:10; *see* Colorado Board of Pharmacy ("CBP") regulations (Ex. S, attached). In addition, plaintiff admitted that she received specific training on "know[ing] the State Board of Pharmacy rules and regulations with respect to duties of an unlicensed personnel," Vigil Depo. (Ex. Q) at 80:2-11, "follow[ing] the rules and regulations governing refills . . .," *id*. at 80:13-19, and, more specifically, being "able to recognize the prescription-related telephone calls a technician cannot handle." *Id*. at 81:5-11.

(Def.'s Reply, Reply to Statement of Undisputed Material Facts ¶ 10.)

Moreover, the parties dispute wether the order Plaintiff took on the phone was a refilled or a new prescription. (*See, e.g.*, Def.'s Br., SOF ¶ 16; Pl.'s Resp., RSOF ¶ 16.) Plaintiff claims that Defendant's training material did not include any information regarding change in strength of a prescription. (Pl.'s Resp. *passim*.) Defendant, on the other hand, relies solely on its pharmacists' affidavits to argue that a change in strength changes the nature of the task from a refill to a new prescription and that, under these circumstances, a pharmacy technician cannot receive the prescription. (*See, e.g.*, Def.'s Reply, Reply to Statement of Undisputed Material Facts ¶ 16 [citing Ex. E at 5 (Gillispie Aff.)].) However, neither Defendant nor any of its pharmacists claim that they actually conveyed this information to Plaintiff during the training courses or on-the-job training. (*See* Def.'s Br., Ex. E at 5 [Gillispie Aff.], Ex. G at 4 [Papineau Aff.], Ex. F at 3 [Chung Dep.] [all merely asserting that "(a)ll Safeway employees ***should be*** aware of this very basic rule"] [emphasis added].)

In addition, Plaintiff's allegations suggest that she planned to call and confirm the strength of the prescription with the doctor before refilling it. (*See* Def.'s Reply, Ex. Q at 20 [Vigil's Dep.], *see also* Def.'s Reply at 5 [citing excerpts of Ex. Q at 20 (Vigil's Dep.)].) Defendant's argument suggests that even before checking with the doctor, according to the procedure, Plaintiff should have known that she was dealing with a new prescription and should not have taken the order. (*See* Def.'s Reply.) Again, Defendant relies solely on its pharmacists' statements and does not offer any citation to its training material to support the legitimacy of its argument.

### B. Did Safeway Properly Investigate the Incident?

Defendant alleges that "Plaintiff was placed on suspension pending an investigation." (Def.'s Br., SOF ¶ 51) Plaintiff claims that "[n]o investigation occurred." (Pl.'s Resp., RSOF ¶ 51.) Defendant does not offer any evidence as to what steps it took through the alleged investigation of Plaintiff's alleged violation of its policy and on what basis it concluded that firing her is an appropriate disciplinary remedy under the circumstances.

Moreover, Defendant admits that it was only as a result of Plaintiff's adamant statement that it discovered the existence of the second doctor whose nurse "Amy" had called and ordered the change in prescription's strength. (*See* Def.'s Br., Ex. I at 16 [Chung Dep.].) This statement gives rise to another unanswered question regarding the legitimacy of its proffered reason, *i.e*, why Defendant did not believe Plaintiff's statement and contact the patient to verify the strength of the prescription right after Plaintiff told her supervisor about the phone call? Defendant does not address this issue, and instead argues that:

Plaintiff's error caused the patient to have been under-dosed for several days on a medication that regulates blood pressure and heart rate. Chung Depo. (Ex. T) at 18:10-14, 102:15-103:10. In usurping the function of the licensed pharmacist, plaintiff neglected to obtain the identity of the prescribing doctor and, consequently, Safeway failed to discover that the dosage increase had been authorized by a new doctor. As a result, the patient was dispensed the medication at the original 50 mg strength on January 22, 2004. On January 26, 2004, after Safeway's investigation revealed a new prescriber, the patient received the correct 100 mg strength.

(Def.'s Reply, Reply Concerning Undisputed Facts ¶ 56.)

### C. Conclusion

As mentioned above, Safeway, a pharmacy, and its pharmacists are licensed to practice pharmacy and are therefore governed by the Board of Pharmacy regulations. COLO. REV. STAT. § 12-22-101; *see also facts* § (1)(d), *supra*. But Plaintiff, an unlicensed pharmacy technician is not governed by the Board of Pharmacy regulations. *Id.* Accordingly, in order to prove that Plaintiff violated the Board of Pharmacy regulations, by which she is not governed, Defendant must demonstrate that the particular regulation became a job requirement for a pharmacy technician at Safeway through its training material. Defendant, however, has failed to so demonstrate, and instead, generally claims that Plaintiff "violated *a* rule or regulation of the State Board of Pharmacy and Safeway policy," without explaining *which* Safeway policy incorporated which Board of Pharmacy regulation that governs the changes in strength of prescriptions. (*See, e.g.*, Pl.'s Resp., Ex. 7 at 6 [Defendant's Denial Letter] [emphasis added].)

Based on the foregoing, the court finds that the record does not establish that Defendant's reason was adequate grounds for firing Plaintiff, at least for the purposes of summary judgment. *See Piercy*, 480 F.3d at 1200 (moving to the final factor, *i.e.*, pretext, only after the record

-17-

plainly established that defendant's three proffered reasons, when sustained, were adequate

grounds for firing plaintiff.)  At a minimum, there exists a material issue of fact as to whether

Plaintiff, an unlicenced pharmacy technician, had received the training to know that she was not

allowed to change the strength of the prescription.  Therefore, Plaintiff's retaliation claim

survives summary judgment.

### iii.    Pretext

Even if the facts could support Defendant's allegation that its proffered reason was

legitimate, Plaintiff could still avoid summary judgment.  Assuming that Defendant could offer a

legitimate reason for firing Plaintiff, at this stage the burden would shift back to Plaintiff to

demonstrate that the stated reason was pretextual.  *Piercy*, 480 F.3d at 1200 (citation omitted).

"In establishing pretext, an employee can show the employer's proffered reason was so

inconsistent, implausible, incoherent, or contradictory that it is unworthy of belief."  *Id*. (citation

and internal quotations omitted).

"Challenge of pretext, however, requires a court to look at the facts as they appear to the

person making the decision to terminate, not the aggrieved employee."  *Id.* (citations and internal

quotations omitted).  "The relevant inquiry is not whether their proffered reasons were wise, fair

or correct, but rather we ask whether they believed those reasons to be true and acted in good

faith upon those beliefs."  *Id.* (citations and internal quotations omitted).  "Even a mistaken

belief can be a legitimate, non-pretextual reason for an employment decision."  *Id.* (citation

omitted).  Accordingly, "their good faith perception of the employee's performance is relevant,

not plaintiff's subjective evaluation of her own relative performance."  *Id.* at 1200–01 (citations

and internal alteration omitted). The Tenth Circuit's standard for "quantum of evidence" in a retaliation claim is whether plaintiff has offered "any evidence that the decisionmakers who terminated her . . . did not honestly believe [plaintiff] committed the . . . violation[] or terminated [plaintiff] for retaliatory reasons." *Id.* at 1201.

In this case, Plaintiff has offered enough evidence that would allow the factfinder to conclude that Defendant did not honestly believe Plaintiff committed the alleged violation, *e.g.*, evidence regarding Defendant's knowledge that (1) Plaintiff is not licenced to practice pharmacy and therefore is not governed by the State Board of Pharmacy Regulations, and (2) Plaintiff never received any training from Safeway that taught and required her not to change the strength of prescriptions. (*See* Pl.'s Resp.)

Moreover, Plaintiff has offered evidence that (1) the other employees disciplined or terminated by Defendant: (a) had acted in a way that placed the company in an adverse liability situation and/or harmed customers, but nonetheless received warning letters or consultation pointing to the specific Safeway policy violated by them before being disciplined, and (b) were not terminated without a warning or consultation unless they committed multiple or intentional serious violations, but (2) Plaintiff while exonerated before she was fired — Defendant obtained information that exonerated Plaintiff, showing that in fact there was a second doctor who had changed the strength of the patient's prescription, before firing her, (Def.'s Br., Ex. I at 16 [Chung Dep.]) — was terminated for an alleged violation of Safeway policy (a) without being put on notice as to which policy, (b) without being offered any evidence demonstrating that she had knowledge of the alleged unnamed policy, (c) without receiving any consultation or warning

before her termination, (d) while her report of the telephone conversation, if believed and not altered before checking with the patient, would not result in placing the company in an adverse liability situation and harm to the customer.  (*See* Pl.'s Resp., Ex. 9 at 2–16 [Disciplinary Letters], Def.'s Br., Ex. 7 at 6 [Defendant's Denial Letter].)  "[E]vidence of less severe discipline for other employees that are not members of the same protected group who violated work rules of comparable seriousness can establish pretext."  *Piercy*, 480 F.3d at 1202 (citing *McDonnell Douglas*, 411 U.S. at 804, 93 S.Ct. 1817.)

Based on the foregoing, the court finds that Defendant's proffered reasons for termination are sufficiently weak, implausible, or inconsistent so as to raise a disputed factual issue requiring further proceedings for resolution.  *See id.* at 1201 (citing *Jaramillo v. Colo. Jud. Dep't*, 427 F.3d 1303, 1308 [10th Cir. 2005]).  Therefore, even if Defendant's proffered reason for firing Plaintiff were legitimate, the evidence offered by Plaintiff is sufficient to allow the fact finder to conclude that Defendant did not honestly believe that plaintiff committed the violation and retaliatory motive was a determinative factor in her dismissal.  Accordingly Plaintiff's retaliation claim survives summary judgment.

### b.   The Breach of Contract Claim[1]

The no-fault settlement agreement provided that Safeway would support Plaintiff's request for additional training available through the company.  (Def.'s Br., Ex. D at 3 [No-Fault Settlement Agreement].)  Plaintiff claims that Defendant breached the no-fault settlement agreement because it did not provide the training requested by Plaintiff.  (*See* Compl., Pl.'s Resp.)  Defendant claims that July and November 2003 training courses combined with the "on-the-job guidance and training from at least 2 of the 3 pharmacists" discharged its obligation under the terms of the Settlement Agreement.  (Def.'s Br. at 17.)

---

[1] Defendant does not seem to have been able to make up its mind whether to challenge the enforceability of the provision at issue.  (*See* Def.'s Br., at 17 [merely touching the issue by stating that "even assuming that the training provision is enforceable, Safeway has more than discharged any obligation . . . ."], *see also* Def.'s Reply at 14 [claiming that its mention of the term enforceability required Plaintiff to address the issue, but again stating that "[e]ven putting aside the issue of enforceability, however, the provision . . . ."]).  The court finds Defendant's hesitance justified since the one case it cites in support of its attempt to challenge the enforceability of provision E of the no-fault settlement agreement, *i.e.*, Defendant's commitment to providing any available training to Plaintiff upon her request, is readily distinguishable from the facts of the case in hand on its face.  Defendant relies on *Marsh v. Delta Air Lines, Inc*., 952 F. Supp. 1466 (D. Colo. 1997), to argue that "non-specific expressions of an employer's intent do not rise to the level of a definite and enforceable term of employment."  (Def.'s Br. at 17 n.4 [citing *Marsh*, 952 F. Supp. at 1466 (stating that "employer's expressions of its intent to provide fair treatment of all personnel are, at best, vague assurances, and do not constitute definite terms of employment."].)

Assuming that the issue of enforceability was properly raised, the court finds that unlike the contract term in *Marsh*, provision E of the parties' no-fault settlement agreement provides for a definite term assuring Plaintiff that she will get any available training if she requests it, and is therefore not vague.

### i. Disputed Issue of Fact: Did Safeway Discharge Its Obligation Regarding Providing Training Requested by Ms. Vigil Under the Terms of the Settlement Agreement?

The parties agree that Plaintiff was sent to the same three-day training course in July and November 2003. (*Id.*, SOF ¶¶ 13, 15; *admitted in relevant part at* Pl.'s Resp., RSOF ¶¶ 13, 15.) Plaintiff claims that the July and November training courses only covered the basics and were not what Plaintiff requested and that Defendant has not provided evidence that would suggest otherwise. (Pl.'s Resp. at 13.) Defendant responds that "the contents or substance of the training are explicitly identified in the Training Objectives (Exhibits E1 and E2), and verified by plaintiff in her deposition." (Def.'s Reply at 14–15.) In addition, Defendant asserts that "Plaintiff has no evidence that other training was available through the company, and not offered to her," but does not state that Safeway does not offer any training other than the basic training Plaintiff received in July and November 2003. (*See* Def.'s Reply at 14.) Moreover, Defendant does not address whether it ever responded to Plaintiff's express request for additional training "in third party insurances input of new RX." (*See* Pl.'s Resp., Ex. 7 at 2 [11/07/03 Letter].)

The court, based on the incomplete record before it, finds that exhibits E1 and E2 as their titles suggest only explain the "Training Objectives" and do not provide information regarding the content of what was covered during these courses. Therefore, there exist disputed issues of material fact regarding (1) what was covered in the July and November courses and whether it could satisfy the no-fault settlement agreement's requirement, including Plaintiff's request for training in third party insurance input; and (2) whether Safeway offered any courses other than

the three-day courses Plaintiff attended.  Accordingly, summary judgment on this issue is improper at this stage.

**3.      Conclusion**

Based on the foregoing, it is therefore ORDERED that:

1.      DEFENDANTS' motion for summary judgment (# 36) is DENIED.

The court will hold a Final Pretrial Conference commencing at 10:15 o'clock a.m. on September 17, 2008 in Courtroom A201 of the Alfred A. Arraj United States Courthouse, 901 19th Street, Denver, Colorado.  In preparing for and participating in the conference, the parties and counsel will (1) follow the Instructions for Preparation and Submission of Final Pretrial Order, a copy of which can be downloaded from the court's web site, specifically http://www.cod.uscourts.gov/Documents/Judges/EWN/ewn_fin_pre_ord_ins.pdf and (2) utilize the specific template located at http://www.cod.uscourts.gov/Documents/Judges/EWN/ewn_fin_pre_ord.wpd  These specific web addresses should be used to insure that the proper format is observed.

Dated this 3rd day of September, 2008.

BY THE COURT:


s/ Edward W. Nottingham
EDWARD W. NOTTINGHAM
Chief United States District Judge